# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 05-1362


**STATE OF LOUISIANA**

**VERSUS**

**LEKEITHEN SHONDELL HARRIS**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 266178
HONORABLE W. PEYTON CUNNINGHAM, JR., DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


**BILLY HOWARD EZELL**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***


Court composed of Sylvia R. Cooks, Billy Howard Ezell, and James T. Genovese, Judges.


**AFFIRMED.**


**James C. Downs**
**District Attorney - Ninth Judicial District Court**
**701 Murray Street**
**Alexandria, LA 71301**
**(318) 473-6650**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Raymond L. Simmons**
**Attorney At Law**
**1606 Scenic Highway**
**Baton Rouge, LA 70802**
**(225) 383-3675**
**Counsel for Defendant/Appellant:**
**Lekeithen Shondell Harris**

**Lekeithen Shondell Harris**
**F.W.C.C. ARDC**
**7990 Caddo Drive**
**Keithville, LA 71047**

**EZELL, JUDGE.**

The Defendant, Lekeithen Harris, was charged by bill of information on August 14, 2002, with one count of attempted second degree murder in violation of La.R.S. 14:27 and La.R.S. 14:30.1. The Defendant subsequently waived formal arraignment and entered a plea of not guilty on August 16, 2002. The trial court thereafter denied the Defendant's request for release on bond but later set his bond at $250,000.00. On August 18, 2003, the Defendant filed a motion to appoint a sanity commission, which was granted by the judge. Following a sanity commission hearing on December 1, 2003, the trial court adjudged the Defendant competent to proceed with his trial.

The Defendant's trial took place on June 22, 2005, following jury selection the previous day. The jury found the Defendant guilty of attempted second degree murder. The Defendant subsequently filed a motion for a new trial, which was denied on July 18, 2005. At the same hearing, the trial court sentenced the Defendant to serve fifty years without the benefit of probation, parole, or suspension of sentence.

The Defendant now appeals, asserting the following assignments of error:

1.
The Honorable District court [sic] committed error when it refused to permit defendant, on motion of counsel, to change his plea to not guilty and not guilty by reason [of in] sanity.

2.
The Honorable District Court committed error when it refused to continue the trial even though defendant's DNA expert had not completed its testing, and thus would not be able to participate in trial.

3.
The Honorable District Court committed error when it refused to continue the trial because of the lack of availability of defendant [sic] D.N.A. expert, even though the court had paid for same, and defendant had relied on the case not being ready for trial, and did not have his alibi witness available.

1

4.

The Honorable District Court committed error when it denied defendant[']s challenge for cause to a juror who not only knew the prosecutor, but had worked with him in the prosecution of a murder case.

5.

The Honorable Trial court committed error when it refused to order prosecutor to give a race neutral reason for striking "Black" jurors, when the only black jurors who were retained had either directly or through a family member been the victim of criminal activity.

## STATEMENT OF FACTS

Blaine Buchanan testified that on March 26, 2002, he was at home in Glenmora, Louisiana with his girlfriend, Brandy Fogel. He stated that shortly after 9:30 p.m., Brandy Fogel answered a knock at the door. Both Mr. Buchanan and Brandy Fogel testified that they recognized the person at the door as the Defendant, who was their neighbor; he was wearing a black trench coat and a sock hat. Mr. Buchanan stated that the Defendant requested permission to take an aquarium from a scrap pile he had cleaned from his yard the previous day. Mr. Buchanan testified that when he and the Defendant did not see the item in the scrap pile in the front of the house, the Defendant suggested that they look behind the house.

Mr. Buchanan stated that while looking behind the house, he was struck three times in the head. He testified that he turned around and saw the Defendant holding a hammer and that the Defendant then told him to get on his knees and face away from him. After hearing that, Mr. Buchanan says that he attempted to run toward the front of the house; and reached the street that passed in front of the house. Mr. Buchanan stated that the Defendant followed him to the street and continued to hit him approximately four more times in the head with the hammer.

Brandy Fogel testified that she had heard a commotion and Mr. Buchanan's screams and went out to her front porch, where she first saw the Defendant in the street standing over Mr. Buchanan and swinging at him. She ran into the house to get

her cellular phone and went to the street, where she heard the Defendant tell her that if she phoned the police, he would kill Mr. Buchanan. Brandy Fogel screamed for help and laid on top of Mr. Buchanan in an attempt to shield him from additional blows from the hammer.

Brandy Fogel's grandmother, Myrldene Fogel, who lived directly across the street from Mr. Buchanan and Brandy Fogel, heard the commotion in the street and went outside into her own front yard. Myrldene Fogel testified that she recognized the Defendant, who she had known for four or five years as a resident of the neighborhood and a customer in her pet supply store. Myrldene Fogle stated that, upon seeing the Defendant standing over the couple with a hammer and hearing her granddaughter's screams, she yelled for the Defendant to stop. Myrldene Fogle testified that the Defendant then began to approach her, and she called out for her husband to call the police and bring his gun outside. She said that the Defendant walked away from the scene soon after she yelled for her husband, and Brandy and she took Mr. Buchanan inside and waited for assistance.

Assistant Chief Gene Johnson of the Glenmora Police Department testified that during a subsequent search of an abandoned lot in the area, officers found "a black trench coat, a maroon sock hat, a pair of brown gloves and a metal hammer." The Defendant was arrested at his home and was brought to the scene, where he was identified by Brandy and Myrldene Fogel. He was subsequently charged with attempted second degree murder.

## ASSIGNMENT OF ERROR NUMBER ONE

For his first assignment of error, the Defendant asserts that the trial court erred in denying his request to change his not guilty plea to not guilty and not guilty by reason of insanity. In support of this argument, the Defendant argues that the attorney

3

who had filed the not guilty plea later withdrew from the case due to a conflict, and his trial counsel should have been allowed to enter a new plea of not guilty and not guilty by reason of insanity. Additionally, the Defendant points out that the case was not scheduled for trial at the time the change of plea motion was denied and was not actually tried until a year after that time.

Louisiana Code of Criminal Procedure Article 561 governs the change of a plea of "not guilty" to a plea of "not guilty and not guilty by reason of insanity" and provides the following:

> The defendant may withdraw a plea of "not guilty" and enter a plea of "not guilty and not guilty by reason of insanity," within ten days after arraignment. Thereafter, the court may, for good cause shown, allow such a change of plea at any time before the commencement of the trial.

"'Good cause' within the meaning of this statute has been found where evidence indicated a defendant was suffering from a mental disorder such as schizophrenia or was undergoing psychiatric treatment." *State v. Whiticar*, 487 So.2d 514, 516 (La.App. 4 Cir. 1986) (citing *State v. Taylor*, 254 La. 1051, 229 So.2d 95 (1970); *State v. Delpit*, 341 So.2d 876 (La.1977)). The Louisiana State Supreme Court has reviewed claims regarding "good cause" utilizing an abuse of discretion standard. *See Taylor*, 229 So.2d 95; *Delpit*, 341 So.2d 876.

In the instant matter, the trial court held a hearing on the Defendant's motion for change of plea on February 17, 2004. The Defendant submitted the transcript from his bond reduction hearing, which contained testimony by the victim, Brandy Fogel, and Myrldene Fogel that was similar to what they provided at trial as described in the "Statement of Facts" section of this opinion. The trial court also heard from the Defendant's mother, Marian Harris, through her testimony included in the transcript of the bond reduction hearing and through testimony she provided directly at the

4

change of plea hearing. Ms. Harris stated at the change of plea hearing that her son had been "under a great deal of pressure" and was "very, very upset[]" at the time that he decided to file the motion to change his plea and request a sanity hearing. She also stated that her son had not been at the scene and that he told her that he did not commit the attack on the victim.

In support of the change of plea motion, the Defendant's counsel argued that, at the bond hearing, the victim's description of the crime was "highly suggestive of somebody, whoever did it, that they weren't, you know, in their right mind." The Defendant suggested that the bizarre nature of the crime itself made "no sense" in that the Defendant was charged with walking up to his neighbor's front door and bringing the victim outside in order to attack him for no reason.

Because the Defendant waived his formal arraignment in August 2002, and filed his motion for change of plea in 2003, we find that his request could only have been granted under La.Code Crim.P. art. 561 for good cause shown. We find that the only evidence produced by the Defendant at the hearing on the motion to change his plea was his argument that the person who committed the crime had to have lacked full mental capacity in order to commit the crime. We note that the Defendant did not present any evidence regarding his impaired mental capacity at the time the alleged crime was committed, nor at any time prior to his incarceration on the present charge. Consequently, we find that the trial court did not abuse its discretion in refusing to allow the Defendant to change his plea for lack of a "good cause" from "not guilty" to "not guilty and not guilty by reason of insanity." We find this assignment lacks merit.

5

## ASSIGNMENTS OF ERROR NUMBERS TWO AND THREE

In his next two assignments of error, the Defendant asserts that the trial court erred in denying his request for a continuance to allow for the completion of DNA testing. The Defendant alleges that the trial court had approved his request for independent DNA testing of certain evidence, but then refused to grant a continuance of the trial when that expert had not finished the testing in time for the trial. The Defendant additionally asserts that because he had relied on that continuance, his alibi witness was not available to testify at his trial.

Louisiana Code of Criminal Procedure Article 707 states that a motion requesting a continuance must be made in writing at least seven days prior to the commencement of trial. The grounds for the motion must be specifically alleged. Additionally, where the party requesting the continuance is the defendant, those grounds must be verified with an affidavit by the defendant or his counsel.

> The granting of a continuance is within the discretion of the court. La.Code Crim.P. art. 712. In general, the denial of a continuance is not grounds for the reversal of a conviction absent an abuse of discretion and a showing of specific prejudice caused by the denial of the continuance. *State v. Savage*, 575 So.2d 478 (La.App. 3 Cir.), *writ denied*, 586 So.2d 556 (La.1991). Where the motion is based on the insufficiency of time for preparation by counsel, the specific prejudice requirement has been disregarded only in cases where the preparation time was so minimal as to cast doubt on the basic fairness of the proceedings. *Id.*

*State v. Anderson*, 96-1515, p. 3 (La.App. 3 Cir. 4/29/98), 714 So.2d 766, 768, *writ denied*, 98-1374 (La. 10/9/98), 726 So.2d 25.

The record in the instant matter reflects that on February 17, 2004, the trial court granted the Defendant's request for funding for DNA testing. However, at that hearing, the Defendant did not know exactly how many samples he would need to be tested and consequently could not request a specific monetary amount. The trial court

6

gave the Defendant thirty days to obtain an itemized letter specifying that information from the testing facility and submit it to the court.

The minutes of the record reflect that a hearing was held on April 19, 2004, regarding DNA evidence. The minutes state: "Defense advises the Court that the evidence tested by the State will also be tested by the Defense. The Defense will also provide the Court with a list of evidence that they wish to have tested." The record contains a "Declaration as to DNA Testing" accompanied by a signed order which states that the Defendant intends to test a trench coat, "however he cannot make a determination as to what other items would need to be tested for DNA purposes prior to other motions being held[.]" Additionally, the Defendant filed a motion to view evidence, on which a hearing was held on June 21, 2004. At that hearing, the Defendant argued that he wanted to view the items prior to sending them out to be tested for DNA purposes. The trial judge heard argument on the matter and continued it until June 24, 2004, although we were unable to locate a notation confirming the occurrence of that hearing in the record.

The record reflects the hearing on the matter was held on September 20, 2004. At that hearing, defense counsel stated that the only piece of evidence to be submitted was the trench coat, that it had not yet been tested, and that a cost estimate had not been obtained for the testing. The trial court stated that it had already granted payment for the costs of testing, but ordered the Defendant to submit to the court within forty-eight hours an estimate of the amount necessary. A trial date of February 22, 2005, was also set at that hearing.

While the record is unclear whether such an estimate was submitted to the court within the forty-eight-hour deadline, the Defendant did file a "Motion to Approval

7

[sic] Specific Fee for DNA Testing" on January 10, 2005. The trial court granted the motion two days later.

The Defendant subsequently filed a motion for continuance on February 28, 2005, which stated that the DNA testing had not been completed. The minutes reflect that the trial date was reset for April 18, 2005. On April 18, the minutes reflect that the Defendant made another motion for continuance, which was granted. A new trial date of June 20, 2005 was set. The minutes indicate that the Defendant made another motion for continuance on June 20, 2005, which was denied by the trial court. The Defendant's jury trial began the next day.

We find that the record in the present case does not establish that the trial court abused its discretion in denying the Defendant's request for a continuance for time to complete DNA testing. The record reflects that the trial court initially approved the Defendant's request in February 2004 and conducted numerous hearings dedicated to obtaining information from the Defendant relevant to conducting and paying for the desired testing. The minutes indicate that the Defendant was granted at least two continuances of his trial date to obtain results for the tests. The trial was held in June 2005, nearly a year and a half after the Defendant's funding request was granted. Although the Defendant cites "paperwork, [arrangement] for pay and the normal backlog at the laboratory[,]" on appeal, we submit that the trial court provided the Defendant a sufficient opportunity to procure DNA tests.

The Defendant also argues that because his continuance request was denied and the trial was held on June 21, 2005, he was unable to secure the presence of a witness who would validate his alibi. The record indicates that the Defendant requested the continuance on the day that his trial was scheduled to begin. We additionally note that although the minutes do not specifically state that the motion was made orally,

8

we could not locate a written motion for continuance in the record relating to the June 20, 2005 trial date. As previously noted, La.Code Crim.P. art. 707 requires that a motion for continuance be made in writing at least seven days prior to trial. Therefore, we find that the Defendant did not comply with the requirements of La.Code Crim.P. art. 707 and the trial court did not abuse its discretion in denying the Defendant's request for a continuance.

Additionally, the Defendant argues in his appellate brief that his alibi witness was a person with whom the Defendant was speaking on the telephone at the time of his arrest. The Defendant testified at trial that he was in his home talking to his boss at the time of the incident. He said that he saw a man outside his house and his boss gave him the telephone number for Police Chief Benny Coaker and told him to call, which the Defendant testified that he did. Neither the boss nor Chief Coaker testified at the Defendant's trial, although it appears from his appellate brief that the Defendant is asserting that the boss is the alibi witness at issue.

In his closing argument, defense counsel stated: "Now the boss is not here, we -- trial came up kind of short -- on short notice, we couldn't reach him. But the Chief of Police is supposed to be on call, he works for the City of Glenmora, I think [the State] even called his name as a witness, but they didn't bring him." We note that the record does reflect that Benny Coaker was present for the State and was sworn in and placed under the rule of sequestration at the start of the trial. However, the Defendant did not call Mr. Coaker to testify.

Furthermore, even though the Defendant's motion for a continuance was denied, the June 20, 2005 trial date was noted in the minutes on April 18, 2005. We note that the Defendant had approximately two months to issue a subpoena demanding the witness's presence. We additionally find that the proper filing of his

9

motion for continuance at least a week before the trial date may have provided more time, albeit a few days, to secure the witness's presence.

Consequently, the trial court did not abuse its discretion in denying the Defendant's motion for continuance on June 20, 2005. We find that the Defendant's failure to admit his own DNA testing results and to present his alibi witness was occasioned by his own failure to timely conduct the test and secure the witness prior to trial. Accordingly, we find these assignments lack merit.

### ASSIGNMENT OF ERROR NUMBER FOUR

In his next assignment of error, the Defendant alleges that the trial court erred in denying his challenge for cause to "a juror who not only knew the prosecutor, but had worked with him in the prosecution of a murder case." The Defendant argues that he was prejudiced by the juror's bias due to her relationship with the assistant district attorney.

Louisiana Code of Criminal Procedure Article 797 provides for challenges for cause and states that either the state or a defendant may challenge a juror for cause where "[t]he relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict."

> The fact that a prospective juror is acquainted with a party named in La.C.Cr.P. Art. 797(3) is not in itself grounds for a challenge for cause. The facts must reasonably lead to the conclusion that the relationship would influence the juror in arriving at a verdict. A challenge for cause should be granted even if the juror declares an ability to remain impartial when the juror's responses reveal facts from which bias, prejudice, or impartiality may be reasonably implied. The trial judge is afforded wide discretion in ruling on a challenge for cause, and the ruling should not be disturbed absent an abuse of discretion. *State v. Rexrode*, 536 So.2d 671, at 673 (La.App. 3d Cir.1988).

*State v. Love*, 594 So.2d 1076, 1078 (La.App. 3 Cir. 1992).

10

In *Love*, this court affirmed the district court's denial of the Defendant's challenge for cause of a juror who was a frequent social companion of the district attorney and had employed him as his personal attorney for several years. *Id.* The venireman stated that his relationship with the district attorney would not cause him to favor the State's side or hinder his impartiality and ability to apply the law. *Id.*

In the present matter, the juror answered affirmatively during voir dire when the assistant district attorney asked the panel if any of the members knew him, or the Defendant, or his counsel. The assistant district attorney posed the following questions to the juror (first ellipsis supplied):

**By [Assistant District Attorney]:**
. . . Ms. Torres, I think I met you a number of years ago because you are a good friend of a woman that lost her daughter to a homicide and I was prosecuting that case, right?

**By [Juror]:**
_____Right.

**By [Assistant District Attorney]:**
And I think I had a number of conversations. I know it's upsetting and I know you were close with Ms. Fields.

**By [Juror]:**
Yes, sir.

**By [Assistant District Attorney]:**
And I hate to bring that up again Ms. Torres, but I have to. The fact that you and I had some contact in discussing that case and preparing that case for trial, that was a case that actually went to trial in this jurisdiction.

**By [Juror]:**
Yes.

**By [Assistant District Attorney]:**
That wouldn't cause you to lean one way or the other. And Ms. Torres, I think you sat through that trial . . .

**By [Juror]:**
I sure did.

**By [Assistant District Attorney]:**
   . . . as I recall. And you know that, you know under the law the State has the burden of proof and we're required to prove a case beyond a reasonable doubt. And I know y'all heard this across the hall, so I'll go through it real quick. And you understand that you only can decide this case on the evidence you hear from the witness stand.

**By [Juror]:**
   Right.

**By [Assistant District Attorney]:**
   So whatever happened in that, in the other case, you can put that aside, you can judge LeKeithen Harris and his actions based on what you hear in this courtroom here today and you'll do that?

**By [Juror]:**
   Yes, sir.

Additionally, defense counsel asked the juror if she thought that her past relationship with the prosecutor would cause her any problem if he didn't prove his case. She stated that it would not.

This court has previously stated that the mere existence of a relationship between the juror and a party listed in La.Code Crim.P. art 797 alone does not constitute grounds for a challenge for cause. *State v. Melbert*, 546 So.2d 948 (La.App. 3 Cir. 1989). In *Melbert*, the trial court's denial of a challenge for cause was upheld where the juror testified that he knew three of the police officers who would be testifying and that the district attorney's prior law firm had advised the gas company he managed. The juror stated that his relationship with the officers was not a close one and that neither it nor his business relationship with the district attorney's firm would influence his ability to be impartial or objectively assess credibility.

A similar issue was raised in *State v. Rexrode*, 536 So.2d 671 (La.App. 3 Cir. 1988), wherein this court considered the defendant's argument that his challenge for cause to a potential juror was improperly denied. In *Rexrode*, the juror "stated that one of the assistant district attorneys prosecuting the case had handled a legal matter

for him some five years previously." *Id.* at 674. Additionally, the juror stated that a state police officer who was a potential witness and the district attorney were members of the same fraternal organization as he was, although they were members of different lodges. The juror stated that he would follow the law given to him by the judge, that he understood the burden of proof, and that he could perform his duties impartially. This court found that due to the casual nature of the relationships between the juror, the attorneys, the officer, and the trial judge did not abuse his discretion in denying the challenge for cause.

In the instant matter, the juror explained that she had been present for the trial the assistant district attorney had previously prosecuted because the victim was the daughter of one of her friends. Additionally, she testified that she could be impartial if that assistant district attorney were to prosecute the instant matter. We submit that the record reveals no facts which demonstrate that the challenged juror was incapable of serving impartially, or was biased, or prejudiced toward the Defendant. Accordingly, there was no abuse of discretion in the trial court's denial of the Defendant's challenge for cause. We find this assignment lacks merit.

**ASSIGNMENT OF ERROR NUMBER FIVE**

For his final assignment of error, the Defendant argues that the trial court erred "when it refused to order [the] prosecutor to give a race neutral reason for striking 'Black' jurors, when the only black jurors who were retained had either directly or through a family member been the victim of criminal activity."

The United States Supreme Court has consistently held that race alone may not be used as a basis for parties to use peremptory challenges to exclude jurors. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986). *Batson* requires an aggrieved defendant to demonstrate a prima facie case of purposeful discrimination, which is

13

then rebuttable by the prosecution. *Id.* Louisiana has codified this principle in the La.Code Crim.P. art 795, which states in pertinent part:

C. No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.

D. The court shall allow to stand each peremptory challenge exercised for a racially neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror.

E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral reason is given. Those jurors who have been peremptorily challenged and for whom no satisfactory racially neutral reason is apparent or given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge.

The Louisiana Supreme Court has discussed the first step of the *Batson* test, which is prima facie case requirement, noting that the Defendant must demonstrate the presence of three factors, namely: the prosecutor's peremptory challenges were directed at members of cognizable racial and gender groups, the challenges were peremptory and not for cause, and a showing of "circumstances sufficient to raise an inference that the prosecutor struck the venire person on account of being a member of that cognizable group." *State v. Duncan*, 99-2615, p. 12 (La. 10/16/01), 802 So.2d 533, 544, *cert. denied*. 536 U.S. 907, 122 S.Ct. 2362 (2002) (quoting *State v. Givens*, 99-3518, p. 5 (La. 1/17/01), 776 So.2d 443, 449). Although the *Batson* court stated that the trial court should consider all relevant circumstances in determining whether the Defendant has met the prima facie case requirement, the *Batson* court did not

14

articulate a specific rule or guideline for the trial court in making the determination. *Id.* The *Batson* court did provide two examples of relevant considerations, including any questions or statements made by the prosecutor during voir dire which may evidence the existence or lack of discriminatory purpose. Secondly, the Court stated that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Id.* (quoting *Batson*, 476 U.S. at 96-97).

Turning to the present matter, the record reflects the following colloquy when trial court initially heard the Defendant's objection:

> **BY [Defendant's Counsel]:**
> Judge, I would just object to the State's use of their peremptory challenges under -- pursuant to *Batson*. And more specifically, juror on the first page, juror number 5, 8 -- 5, 8, 12, 16. The second page, he used number 3 and 11 are all black and during strike-backs, on the use of his strike-backs in general, the strike-backs on the first page of juror number 11 and 13, all of whom are black, and the fact that two of the jurors that were accepted, juror number 1 on the second page was -- had had traumatic experience, having been stabbed 9 times, and on juror number 7, had had a traumatic experience having been -- he was accepted having been -- had a cousin having murdered. So that's -- that's what we want to make for the record.

> **BY THE COURT:**
> Okay, Mr. Shannon, do you wish to respond?

> **BY [ASSISTANT DISTRICT ATTORNEY]:**
> Judge, I would -- according to my notes, I think the closer I got -- If I'm correct, I think we have -- I think I used 10 challenges.

> **BY THE COURT:**
> Yes sir.

> **BY [ASSISTANT DISTRICT ATTORNEY]:**
> Six black, four white. I think there's 5 blacks on the jury. I just don't think there's a pattern, Judge.

> **BY THE COURT:**
> Well, the Court makes the following observation that what you just said Mr. Shannon is correct, that we have 4 blacks on the jury. Mr. Simmons -- Mr. Simmons' objection is noted, but I also note that he used 12 challenges and all his challenges were to white people. Not all of your challenges, Mr. Shannon, were directed to black people, so there's no set pattern here and on each of the challenges that you made

to black prospective jurors, there was some other reason other than race given for their excuse. So the motion is -- I mean the objection is noted for the record.

Upon a timely defense *Batson* objection, the trial court must determine whether a prima facie case of discrimination has been demonstrated. *Duncan,* 802 So.2d 533. In the instant matter, the trial court specifically found that the Defendant had not demonstrated that the State had exercised a pattern of strikes against potential black jurors. The trial judge additionally noted that reasons other than race were provided for excusing said jurors. We submit that the trial court's express findings that there was no pattern of discriminatory strikes, and that a sufficient reason other than race had been provided, constitute a finding that the Defendant failed to establish a prima facie case of discrimination. *Id.* "A trial court's ruling on a *Batson* claim is entitled to great deference." *State v. Burgess*, 04-121, p. 21 (La.App. 3 Cir. 6/16/04), 876 So.2d 263, 277. Consequently, under the circumstances present in the instant matter, the trial court did not abuse its discretion in allowing the State's peremptory challenges. We find this assignment is without merit.

**CONCLUSION**

Defendant's conviction for attempted second degree murder and sentence of fifty years without the benefit of probation, parole, or suspension of sentence are affirmed.

**AFFIRMED.**

16